11/8/04

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | 3:04-mj-1066 |
| ) | 3:04-cr-163 |
| v. ) | (Judges Shirley/Phillips) |
| ) | |
| IVAN DUANE BRADEN, ) | |
| ) | |
| Defendant. ) | |

## STIPULATION OF FACTS

The parties agree that the following facts are true and form the factual basis for the defendant's pleas of guilty in the above-captioned case:

1. In late 2003, defendant Ivan Duane Braden was graduated from basic combat training at Fort Knox, Ky and became a member of the Tennessee National Guard. During the nine-week training, he received instruction in, among others, weapons, rifle marksmanship and bayonet training, chemical warfare field training and tactical exercises, and armed and unarmed combat.

2. Braden was assigned to the Guard's 278th Regiment, 1st Squadron, Company D, based at the National Guard Armory in Lenoir City, Tennessee. Earlier this year, Braden's Guard unit was activated or "federalized" for deployment to Iraq. During preparatory training in Mississippi, questions arose as to Braden's fitness for duty and he was returned to East Tennessee for evaluation in August, 2004.

3. Upon his return to Tennessee, Braden had a brief meeting with Robert Williams, a retired Guard Staff Sargent, then working as a civilian Department of Defense employee at the Armory in Lenoir City. During this meeting, Braden was given medical

forms to be filled out by a health care provider. The meeting was brief and non-confrontational.

3. Upon Braden's return from Mississippi, he lived with his father and step-mother in Knox County, Tennessee. Certain of Braden's statements and behaviors concerned his father, and his father encouraged Braden to seek mental health care. Braden's father also instructed him to remove a Mossberg .12 gauge shotgun with a pistol grip handle from the residence. Braden later told his father that he had traded this shotgun for a guitar.

4. With his father's encouragement and support, Braden sought treatment from Peninsula Hospital's outpatient care facility located in West Knoxville. During a scheduled counseling session on October 12, 2004, Braden made statements to Peninsula staff which alarmed them and caused them to notify the Knox County Sheriff's Office (KCSO) that Braden could have bombs at his residence and to notify Robert Williams that he was the subject of specific death threats by Braden. Braden was admitted to Peninsula in-patient care facility located in Blount County, Tennessee.

5. On October 12, 2004, the Hazardous Device Unit (bomb squad) of the KCSO responded to the Braden residence located at 2428 East Gallaher Ferry Road, Knoxville, Tennessee, and notified the Federal Bureau of Investigation (FBI). FBI Agents assigned the FBI's Joint Terrorism Task Force also responded to the Braden residence.

6. With consent from Braden's father, investigating officers and agents searched the Braden residence, including a bedroom used by Braden. In Braden's bedroom, investigators discovered a device consisting of three hollow cylinders bound together with tape and connected with wire to a battery and a clock and a large box filled

2

with fireworks which contained explosive powders. According to Sargent Tony Strickland, a trained explosives and bomb technician with the KCSO Hazardous Device Unit, the partially constructed device could be assembled into a functioning destructive device by filling the hollow cylinders with the explosive powders from the fireworks, sealing the ends of cylinders and adding an initiator or detonator. According to Sargent Strickland, a variety of easily obtainable items, including a rocket kit available from numerous retailers, could be used as an detonator. However, no detonator was found in Braden's bedroom.

In Braden's bedroom, Investigators also found several neo-Nazi items such as emblems, paraphernalia, flags, videos and books, several knives and brass knuckles. Investigators also found a photograph that depicted a Nazi flag spread upon the floor with 14 knives, rope, and a jar of Pyrodex neatly arranged on the flag, and a dark colored vest spread out next to the flag. In addition, investigators found handwritten documents with, among other things, handwritten sketches depicting a plan to blow up a building, notes relating to a suicide bombing in a Jewish synagogue, and a note which stated "needs," then listed "Gp wire", "Rocket kit det.", and "more gun powder."

7. Following the discoveries in Braden's bedroom, investigators located Braden's vehicle parked at the Peninsula outpatient care facility in West Knoxville. A dog trained in explosives detection alerted twice for the presence of explosives in Braden's vehicle. A search of the vehicle revealed a backpack containing a plastic jar of Pyrodex (a black powder substitute) gun powder, four empty metal $CO_2$ containers, fuse, three knives, fishing line which could be used to fashion booby traps, rope, and a leather-working tool. According to Sargent Strickland, the $CO_2$ containers, Pyrodex, and fuse, could be readily and quickly assembled into dangerous destructive devices which functioned as

3

grenades that could cause damage to property and death or serious injury to persons. The backpack also contained clothing that could be worn in carrying out an attack, including a black vest, camouflage pants, a dark colored toboggan, and dark colored gloves.

8. On the evening of October 12, 2004, FBI agents assigned to the Joint Terrorism Task Force interviewed Braden at Peninsula Hospital. During this interview, Braden told agents, among other things, the following:

    a. He had admitted himself into Peninsula Hospital because he feared he would kill someone;

    b. He owned a shotgun with a pistol grip handle, the shotgun was in his bedroom, the shotgun was hidden because he told his parents he did not have it anymore.

    c. He had bomb-making materials in his bedroom, he researched how to construct bombs on the internet, and he did not have everything needed for the bomb to explode;

    d. He planned to attack the Tennessee National Guard Armory in Lenoir City on Friday, October 15, 2004, and kidnap and kill Sargent Major [Robert] Williams;

    e. Williams was a nice person, but sometimes nice people had to die;

    f. He also planned to take other Guard personnel and law enforcement officers from an adjacent office hostage and demand that the Guard deliver his Company Commander, Captain Charles Leslie, so he could beat Captain Leslie to death;

g. He planned to execute hostages, including civilians, every two and one half hours until his demand for production of his Company Commander was met;

h. He intended to use his shotgun and knives in carrying out the attack;

i. He was aware of the contents of the backpack in his vehicle;

j. He planned to either be killed by police or blow himself up along with the National Guard Armory and any remaining hostages.

k. Approximately, two weeks earlier, Braden had met and talked at length with two males at a service station on Hardin Valley Road in Knox County; they discussed their mutually held pro-Nazi beliefs and it was this conversation that prompted Braden to plan the attack and takeover of the National Guard Armory; and

l. Braden had planned to commit a suicide bombing of a Jewish church, but decided against it on his belief that Jews were not worth dying for; he had planned to wear a trench coat with explosives and get close to as many people as possible to inflict the greatest amount of damage; Braden planned to raise his arms in the air at detonation for maximum results and had planned to use his knives in order to cause great blood splatter.

9. On October 13, 2004, an explosive enforcement officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives opined that the bomb components recovered from defendant Braden's vehicle constituted a destructive device within the meaning of Title 26, Untied States Code, Sections 5845(f)(3) and 5861(d).

10. On October 13, 2004, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives caused a search of the National Firearms Registration and Transfer Record and no firearms (including destructive devices) had been registered to Ivan Duane Braden.

11. On October 13, 2004, FBI agents searched Braden's bedroom with the consent of Braden's father. Beneath a mattress, agents found a functional Mossberg .12 gauge shotgun with a pistol grip handle and a fully loaded ammo belt containing 25 rounds of 12 gauge shotgun ammunition, ~~but did not find a shotgun~~.

12. The Tennessee National Guard Armory located in Lenoir City, Tennessee was owned by the State of Tennessee and was a building used in interstate commerce and in activities affecting interstate or foreign commerce. Among other things, the Armory was home to Company D of the 278th, which has been activated for deployment to Iraq. As a part of this deployment, troops were sent to Mississippi and later California for training. The Armory was used for training and meetings for the troops.

The Armory also stored equipment, equipment parts, and other materials acquired from outside the State of Tennessee. Many supplies were obtained using a United States government credit card. Before the unit was is deployed, the Armory also stored firearms and ammunition acquired out of state.

The Armory was also used for storing and processing employment records which are used, among other things, for payroll payments to be made via interstate electronic funds transfers.

A mission of this unit was to assist in maintaining open channels of commerce by clearing interstate highways in the event of inclement weather, major accidents or other obstructive occurrences.

So stipulated this 8th day of November 2004.

Harry S. Mattice, Jr.
United States Attorney

11-8-2004
Date

By: 
David G. Dake
Assistant U.S. Attorney

Date

Ivan Duane Braden
Defendant

11/8/2004
Date

Paula R. Voss
Attorney for Defendant

7