IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | : | |
| | ) | |
| v. | : | NO.: 3:04-CR-163 |
| | ) | JUDGE PHILLIPS |
| | : | |
| IVAN DUANE BRADEN | ) | |

**IVAN BRADEN'S SENTENCING MEMORANDUM;
MOTION FOR DOWNWARD DEPARTURE;
REQUEST FOR VARIANCE**

Comes the defendant, Ivan Duane Braden, by and through undersigned counsel and respectfully submits his Sentencing Memorandum, and respectfully moves the Court to depart downward from the advisory sentencing guidelines, to vary from the advisory guidelines based upon the individual facts of Mr. Braden's case, and to impose a ten-year sentence.

## I. Introduction

Mr. Braden is not a terrorist. Mr. Braden is mentally ill. Mr. Braden took no action to place anyone or anything in danger. Mr. Braden is before the Court because he tried to get admitted into a psychiatric hospital and described things that he was thinking about that were symptoms of his mental illness. Under the circumstances, counsel for Mr. Braden asks the Court to impose a sentence of 10 years with a judicial recommendation that Mr. Braden be placed in a federal medical facility where he can receive psychiatric treatment and substance abuse counseling.

## II.    Factual Background

Mr. Braden was born in Knoxville, Tennessee, on December 11, 1983.  He is now 23-years-old.  Mr. Braden is incarcerated at the Blount County Jail.  He has been incarcerated since October 2004.

Mr. Braden's psychiatric problems and his view of the world are not surprising given that he suffered from debilitating abuse, including sexual abuse, from the time he was a small child until the time he came back to Knoxville to live with his father at the age of nine.[1]  Ivan's parents divorced when he was two, and he lived with his mother and a variety of other people in different states and situations until he was approximately nine.

Remarkably for his situation, Mr. Braden's only prior legal problem occurred at the approximate age of 12 when he was charged with vandalism at a construction site.

After returning to Tennessee to live with his father, Mr. Braden was not able to adjust to school.  He was far behind academically, and he began what his father describes as a pattern of behavior that is intended to shock or perhaps get attention.  Ivan for example started to read neo-Nazi literature and collect Nazi paraphernalia.  He at various times made provocative statements that gained him a degree of negative attention.

---

[1]Mr. Braden's background is set out in more detail in the forensic evaluation dated November 25, 2005 at pp. 3 through 4.  Mr. Braden would ask the Court to consider all of the evidence previously entered into the court record, including the plea related documents [docs. 22-24] and the three forensic reports from the United States Bureau of Prisons Facility at Butner, North Carolina, which have been entered into the record under seal, as well as the testimony of Dr. Landis on May 3, 2007.

Mr. Braden did not complete high school. He obtained a GED in the Fall of 2002. He worked at a series of jobs never holding a job for very long.

When Mr. Braden turned 19, he joined the Tennessee National Guard. He was awarded the National Defense service medal, the Global War on Terrorism service medal, the Armed Forces Reserve medal and the Army service ribbon.[2]

Mr. Braden's unit was sent to Camp Shelby in Mississippi in preparation for deployment to Iraq. Mr. Braden was proud to serve in the military. At the same time, however, he was having violent visions involving indiscriminate killing. Without acting on these impulses, he told a fellow soldier, and it was reported to the Chaplain who referred Mr. Braden to a psychiatric nurse. At that point, he was not discharged but separated from his unit and sent back to Knoxville to obtain counseling.

[2]See Certificate of Release, Exhibit 1 at 009. The documents submitted in support of this memorandum will be submitted in two separate exhibits. Exhibit 1 contains a number of documents, and citation will be to the Bates number. Exhibit 2 will be psychological records that the defendant will seek to file under seal and reference will also be to Bates number.

## III. The Offense Is Intertwined With Mr. Braden's Need And Desire For Psychiatric Treatment.

On August 13, 2004, Mr. Braden was given a travel voucher from Camp Shelby back to Knoxville.[3] When he returned, he was given a General Counseling form informing him that he would require a "Fitness for Duty/Medical Evaluation" before being allowed to return duty. He was given 30 days to obtain information regarding his diagnosis, prognosis and treatment.[4] His interaction was with Sergeant Robert Williams, later one of the individuals Mr. Braden expressed a desire to harm. As noted in the Stipulation of Facts, Mr. Braden's interaction with Mr. Williams was brief and non-confrontational. PSR, ¶ 11.

As of September 1, 2004, Mr. Braden began outpatient treatment with Peninsula Behavioral Health.[5] Mr. Braden's situation was documented in progress notes and in a letter from Peninsula to the Tennessee Army National Guard, Robert T. Williams, dated October 6, 2004.[6] Mr. Braden had appeared complaining of severe depression and extreme thoughts and fantasies about harming others. At the initial psychiatrist appointment, Mr. Braden was diagnosed with Major Depressive Disorder, recurrent, severe with psychotic features and Intermittent Explosive Disorder. He was prescribed Zyprexa. Mr. Braden described his long history of being severely emotionally and physically abused as a child. The report further detailed that Mr. Braden kept all of the

[3]Exhibit 1, 0002.
4 Exhibit 1, 004-005.
5 All of the Peninsula and Lighthouse records obtained by counsel are contained in Exhibit 2. There is considerable repetition of records, but counsel felt it better to include everything than to try to pick and chose which records to present.
6 Exhibit 1, 006-008.

appointments and was very cooperative. He described his violent thoughts as triggered out of nowhere and with no particular provocation. He reported that when he had the thoughts, he experienced a trance like state and out of body type phenomenon. He reported that he could see himself shooting others but he could not stop himself. The outpatient clinic reported that they increased the frequency of his sessions and monitoring. Mr. Braden reported that he is tormented by thoughts that he wanted to stop but admitted that he did not feel that he could control them. He reports that he should work on his treatment full time for the next several months, that any attempt to work should be very limited, that he may need long term psychotropic medications and that it was unclear, if ever, it would be safe for him to be around weapons.

The Peninsula progress note for September 13, 2004 reflects that he had been having blackouts around weapons and uncontrollable thoughts about harming others. He stated that he understood that the Army would not likely take him back and that he was "devastated" because the Army was "his life."[7] The September 21, 2004 progress note reflects similar complaints in trance like state. [8]

The September 30, 2004 progress note reflects a similar discussion in that Mr. Braden gave the facility a release to discuss the matter with his father to have his father watch him closely. [9]

---

7 Exhibit 2, 007.
8 Exhibit 2, 0173.
9 Exhibit 2, 0172.

By October 12, Mr. Braden's symptoms became so severe that he attempted to obtain admission to Peninsula Hospital.

Prior to his attempt to obtain an admission to the hospital, on October 4, 2004, Peninsula's billing office sent Mr. Braden a statement showing a $200.00 balance.[10] According to his father, the letter panicked Ivan because he feared that TennCare had refused to cover his treatment and that he would not be able to continue. Ivan called to let Peninsula know that he could not come because he could not afford to pay for his treatment. After determining that Mr. Braden was not taking his medications and that his symptoms were worsening, Peninsula scheduled him to come in the very next day, October 12, where he was recommended for immediate in-patient treatment at the hospital.[11]

It was on October 12 that he made the inflammatory statements regarding the National Guard Armory. Mr. Braden made the provocative statements in the context of his assessment at the hospital. The handwritten record sets out the statements made by Mr. Braden to the effect that he had a plan to go to the National Guard Armory to "take out" Sgt. Major Williams, and interestingly to take the Highway Patrol office hostage. The record[12] clearly shows that this was not an act of any sort of political terrorism. The record states that it was part of the plan to:

> take the Highway Patrol office hostage – officers, civilians to stop cars at traffic light and pull people out and take them

10 Exhibit 1, 001.
11 Exhibit 2, 001, 006.
12 Exhibit 2, 009 (emphasis added).

> hostage and kill whoever to get his 'message across' **(client) was never clear on what the 'message' is.** Kept stating people to pay attention to someone [with] a machine gun.

There was no message because Mr. Braden never really had one.

The progress note from the date of admission shows specifically that receiving the bills and the concerns that his TennCare was utmost in his mind.[13]

Mr. Braden also saw psychiatrist Arun Jethanandani, M.D., on October 13, 2004. The report summarizes Mr. Braden's statements and also notes that Mr. Braden had been hearing his Sergeant's voice for the past two days and was very upset about it. Dr. Jethanandani performed a mental status evaluation. The doctor noted that frequently during the interview, Ivan became tearful while talking about his childhood. The doctor noted that Ivan is very much bothered by his silent past and at times that he is very upset about thinking violent thoughts. The doctor noted that '[t]he patient appears to have a conscience that has kept him from engaging in violent activities." The psychiatrist diagnosed Mr. Braden as having a psychotic disorder, not otherwise specified.[14]

In an act that was wholly inconsistent with an intent actually to carry out any sort of violent act, on October 13, 2004, Mr. Braden signed a release authorizing Peninsula Hospital to disclose his records to the Blount County Police, the FBI, the Loudon County Police and the Knox County Police. [15]

---

13 Exhibit 2, 0014.
14 Exhibit 2, 0097-0101.
15 Exhibit 2, 0161.

After the initial assessment, Peninsula personnel contacted the Sheriff's Office who in turn contacted the FBI. Mr. Braden then voluntarily met with Special Agent Stanley Ruffin, Special Agent Steven Chopin and Mark Haley. What Mr. Braden told the FBI differed significantly from what he had told hospital personnel. He told the FBI agents that he planned to kidnap and kill Sgt. Major Williams and that he planned to take other National Guard personnel and law enforcement officers from the adjacent office hostage. He stated that he planned to rig the doors of the building to prevent anyone from entering and that hostages including civilians were to be executed every two and one-half hours until his demands were met. [Again, he stated no political demand.] He said that he was going to use his knife and shotgun.[16] It appears that the demand that he intended to make was to have his company commander, Cpt. Leslie delivered to him so that he could be beaten to death. Mr. Braden also related a bizarre story to the effect that approximately two weeks before he had met two individuals at a BP station on Hardin Valley Road. He could not recall their names but spoke to them for about 30 minutes regarding neo-Nazi beliefs and it was this conversation that prompted to plan to take over the National Guard Armory.

None of these outlandish statements was reflected in any fashion by his actions. Mr. Braden never took any steps to go to the National Guard Armory or to harm anyone. Instead, he went to the hospital.

---

16 This statement formed the basis for his plea to possession of a firearm during the commission of a violent felony. The shotgun was hidden under his mattress.

Mr. Braden further told the agents that in his car he had among other things, C02 containers and black powder.

Later, agents searched his home. It was there that the agents discovered the device mentioned at paragraph 5 of the Stipulation of Facts. [Doc. 23] Essentially, the device consisted of cardboard tubes taped together. There was no explosive material, no detonation device. There was a clock taped to the tubes.

The shotgun which forms the basis for count three was apparently not found during the initial search but was later discovered under Mr. Braden's mattress. Again, Mr. Braden did not use the firearm in any fashion.

The facts underlying the sentences are further set out in the Stipulation of Facts, the Plea Agreement and the Presentence Report.

**IV. Mr. Braden Has A Long History Of Psychiatric Issues And Has Received A Number Of Different Diagnoses.**

Regardless of which diagnosis one accepts as accurate, there is no question that Mr. Braden is a very sick young man and that the offense conduct was caused directly by his illness.

Mr. Braden's mental illness is entirely consistent with his childhood history of physical, emotional and sexual abuse. After Ivan came to live with his father, he briefly saw Dr. Clovis Stair, Ph.D. for "depression and anger issues."

Dr. Mark H. Barnes, Ph.D., appears to be the first professional to have thoroughly evaluated Mr. Braden.[17] That testing, done in the school system when Mr. Braden was approximately 14 years old, indicated that he was in the low to average intelligence range, although his actual Performance IQ at that time was only 74. Dr. Barnes found Ivan to be so emotionally disturbed that he needed special education classes. His report also acknowledged that Ivan was "depressed, alienated and angry." He noted further that "[to] his credit, he has been able to keep a lid on a great many potentially destructive feelings and impulses, but this requires a tremendous amount of energy and does not always work well enough to prevent self-defeating outbursts. Ivan's perception and judgment are also compromised by his need to manage extremely intense negative feelings." Ivan was referred for psychiatric intervention and placed on antidepressant medication, but did not continue with it "because his mother kept stealing his medications."

The next record of a psychiatric intervention was in May of 2001, when Ivan was 17 and in high school. Ivan told the school counselor that he was having thoughts about harming another student and the Mobile Crisis unit was called to intervene. A diagnosis was made of Adjustment Disorder, with Mixed Anxiety and Depressed Mood. Although the crisis unit recommended counseling, they made no referral, and Ivan's parents were not informed of this intervention. A few months later, in September of 2001, Ivan again went to the counselor's office to inform them that he was having violent thoughts of

17 Mr. Braden's assessment and treatment history is well summarized by Dr. Katherine Smith's report at Exhibit 2, -0188-92.

harming others and hallucinating. Again Mobile Crisis responded.[18] This time he asked his father for help, and was returned to Dr. Stair for more individual counseling.

Dr. Stair reports that her diagnosis was amended at this time to Major Depression, Moderate, without Psychotic features.[19] She found him to have no problems distinguishing his fantasies from reality, although acknowledging that he suffered from "aggressive fantasies" and in particular, fantasized about harming his mother. He has a "preoccupation with violence and . . . difficulty following rules and accepting authority figures." She also noted his habit of doing and saying "things which outraged those around him."

Ivan voluntarily terminated his sessions with Dr. Stair on April of 2002, but clearly his symptoms and problems did not go away. In November of 2002, he called the Knoxville Police Department and asked for help because he was having thoughts about harming his father and step mother. He was taken to the hospital emergency room by KPD officers that night, but was not admitted. The police report stated that the was "homicidal and psychotic with homicidal ideation towards family" and the emergency room reported that he "felt himself slipping into violence and did not want to hurt anyone." Rather amazingly, however, this 18 year bold was released after being seen and told to go back to see Dr. Stair. He had to call his father, about whom he had just reported thoughts of hurting, to come and get him.

18 See Exhibit 2, 0088-0093.
19 Summary of Dr. Stair, Exhibit 2, 0197-0198.

Back at home, he continued living with his father and step mother, working at minimum wage jobs, and struggling with his demons. He began drinking heavily and smoking marijuana, which increased the tension between him and his family. When the turned 19, he joined the National Guard, as his brother Kenny had done before him. His difficulties at Camp Shelby are set out above, as is his experience at Peninsula Lighthouse and Peninsula Hospital.

Following his arrest, Mr. Braden was referred by his prior counsel to Dr. Kathryn R. Smith, Ph.D., for an evaluation to determine whether a mental health defense was warranted. Dr. Smith saw Ivan in a jail setting on October 16 and on October 21 for a total of five and a half hours. She administered various psychological tests and reviewed all records that counsel was able to procure. She offered a diagnosis of Major Depressive Disorder, Chronic, Severe, Without Psychotic Features. Her reasoning for not finding him to be suffering from psychosis was similar to that expressed by Dr. Stair several years earlier: his apparent ability to distinguish between reality and his auditory and visual hallucinations and the failure to observe the traditional signs of schizophrenia in her two meetings with him. Dr. Smith cautioned, however, that he was clearly "psychologically unhealthy and is in need of further evaluation and treatment" and referred to him as "severely disturbed." Her Axis I diagnosis included the need to rule out a psychotic disorder. [20]

20 Exhibit 2, 0186-0196.

Following Mr. Braden's entry of a guilty plea in this case, the Court granted a written request from the Probation Office and ordered further psychological evaluation be performed by the Federal Bureau of Prisons in aid of sentencing. This order was entered on May 17, 2005 and Mr. Braden was transported to FMC Butner on June 14, 2005. He remained at Butner until December 2, 2005. In a 22 page report, the staff at Butner determined that Ivan Braden's primary diagnoses were, indeed, Schizophrenia, Paranoid Type; Posttraumatic Stress Disorder, Chronic, and Borderline Personality Disorder.

The types of thoughts that Mr. Braden has had to confront are exemplified at page 13 of the Report which details delusional beliefs regarding being controlled by satellites.

Although the government has questioned some of the testing that Mr. Braden participated in, as Dr. Landis explained at the hearing on Mr. Braden's Motion to Withdraw his plea, the Butner staff is highly attuned to issues of malingering. They are very confident in their diagnosis of schizophrenia. They also diagnosed Post Traumatic Stress Disorder and a Personality Disorder. The staff at Butner had the opportunity to observe Mr. Braden over an extended period of time on more than one occasion, which no other evaluator has been able to do.

The first Butner evaluation was done at the request of the Probation Office. The request stated that although Mr. Braden had been evaluated, there were numerous questions that remained. The Probation Office stated that another psychological evaluation might be beneficial in understanding the defendant's behavior and in finding a reasonable sentence.

In answering the questions posed by the Court, the Butner team opined that "there appears to be a strong correlation between Mr. Braden's mental illness and the federal offense." (P. 19). The team further concluded:

> In the two weeks prior to the federal offense, he cancelled therapeutic sessions because he believed that his health insurance had ceased to provide reimbursement. On the day of the offenses, it appears that Mr. Braden genuinely wanted treatments secondary to Schizophrenia and Post Traumatic Stress Disorder. Although he wanted psychiatric hospitalization, he did not have the skills to express his needs appropriately. The provocative statements that he made (that he had plans to kill federal employees and bomb a building used in interstate commerce) were consistent with impulsive remarks made by persons with Borderline Personality Disorder.

Report at p. 19.

Based upon concerns raised by the evaluation, the Court, over the initial objection of defense counsel, had Mr. Braden re-evaluated for competency. After an additional period of review and observation, the review team affirmed its diagnoses and found that Mr. Braden was incompetent to assist with his defense at that time. Mr. Braden underwent further treatment at Butner and was ultimately restored to competence. Since that time, however, Mr. Braden's mental status has varied. His diagnosis remains schizophrenia. The variation may have to do with periodic decisions to cease his medication.

## V. Current Sentencing Procedure.

In the Sixth Circuit, Judge Sutton has succinctly stated what is required at

sentencing post Booker:

> (1) *the judge must make all findings of fact necessary to apply the guidelines to the defendant*, United States v. Orlando, 281 F.3d 586, 600-01 (6th Cir.2002); see United States v. Moreland, 437 F.3d 424, 432 (4th Cir.2006);
>
> (2) *the judge must calculate the guidelines sentencing range correctly*, see 18 U.S.C. § 3742(f)(1); United States v. Gibson, 409 F.3d 325, 338-39 (6th Cir.2005);
>
> (3) the judge must determine *whether to grant a downward departure* or an upward departure from the guidelines, see, e.g., United States v. McBride, 434 F.3d 470, 474-75 (6th Cir.2006); United States v. Puckett, 422 F.3d 340 (6th Cir.2005);
>
> (4) the judge must recognize her discretion to issue a sentence that varies from the guidelines, see Booker, 543 U.S. at 245-46, 125 S.Ct. 738;
>
> (5) *the judge must consider the § 3553(a) factors in exercising her independent judgment about what an appropriate sentence should be*, id.;
>
> (6) the judge must account for any relevant statutory minimum and maximum sentences, see, e.g., United States v. Van Hoosier, 442 F.3d 939, 946 (6th Cir.2006); and
>
> (7) *the judge must give a reasoned explanation for the sentence*, see, e.g., United States v. Jackson, 408 F.3d 301, 305 (6th Cir.2005); United States v. Kirby, 418 F.3d 621, 626 (6th Cir.2005).

See United States v. Buchanan, 449 F.3d 731, 738-39 (6th Cir. 2006) (Sutton, J., concurring) (emphasis added).

Thus, the Court must calculate the advisory guidelines, taking into account any objections. After determining the appropriate guideline range, the Court looks to see whether there are any grounds for departure. Finally, the Court looks at the factors set

forth in 18 U.S.C. 3553(a), of which the advisory guidelines form one element, to determine the appropriate sentence that is no longer than necessary to satisfy the objectives of sentencing.

This procedure was not affected by the Supreme Court's recent decision in Rita. In addressing the impact of Rita, the Sixth Circuit has recently held that "Rita does little to disturb our post-Booker jurisprudence. It does, however, clarify various aspects." U.S. v. Liou, --- F.3d ----, 2007 WL 2066854, *3 (6th Cir., Jul. 20, 2007). The Supreme Court granted certiorari in Rita to decide whether a court of appeals "*may* afford a presumption of reasonableness to a within Guidelines sentence." Rita v. U.S., 127 S.Ct. 2456, 2462 (2007) (emphasis added). The opinion does not establish a presumption of reasonableness for a Guidelines sentence when the District Court is trying to craft an appropriate sentence.

**VI. Guideline Calculations**

The revised report calculates the Guidelines as follows:

| | |
|---|---|
| Base Offense Level | 21 |
| Victim Related Adjustment For Government Official | + 3 |
| Terrorism Enhancement | +12 |
| Obstruction | + 2 |
| Acceptance Of Responsibility | - 3 |
| TOTAL OFFENSE LEVEL | 35 |
| Mandatory Consecutive Sentence Under § 924(c) | 5 years |

Further, the report states that the Criminal History category shall be VI because the terrorism enhancement applies, although the total criminal history points is 0.

Mr. Braden submits that the guidelines should be calculated as follows:

| | |
|---|---|
| Base Offense Level | 21 |
| Acceptance of Responsibility | - 3 |
| TOTAL OFFENSE LEVEL | 18 |
| Mandatory Consecutive Sentence Under § 924(c) | 5 years |

Mr. Braden submits that he is a criminal history category of I. Mr. Braden has provided his objections to the Presentence Report to the Probation Office.

**VII. Grounds For Departure And/Or Variance.**

Depending upon the Court's ruling on the Guidelines issues, Mr. Braden respectfully submits that the Court should consider departing downward from the guidelines and/or varying from a guideline sentence to impose a 10-year sentence. While Mr. Braden submits that a ten year sentence is a harsh result in this case, it is required by the minimum mandatory provisions of the statutes.

The facts as stated above and the following grounds may well support both a downward departure and a variance. Because the grounds are often similar, they are discussed together in this section. The facts listed above and the arguments in this section should be taken into consideration in determining "a sentence sufficient, but not greater than necessary," especially considering the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a).

In the event the Court applies the terrorism guideline, the primary reason for granting a downward departure is that this case falls far outside what could be the heartland of a terrorism case. Mr. Braden acted as a result of, and in an attempt to get treatment for, a serious mental disorder. He did not espouse or advocate or any political agenda in doing so. His offense was highly personal and not political. Indeed, it was noted at the time that he could not articulate what his demands even were. As stated in the factual basis, his interaction with Mr. Williams had been brief and non-confrontational. There was simply no reason, other than mental illness, for Mr. Braden's fixation on Mr. Williams.

Similarly, the application of the terrorism guideline drastically overstates Mr. Braden's criminal history. For a person with zero criminal history points to be sentenced as a career offender calls for a departure from the guideline sentence.

Mr. Braden certainly suffers from diminished capacity. The Policy Statement set out at USSG §5K2.13 states that a downward departure may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity that contributed substantially to the commission of the offense. The Policy Statement provides that the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense. In this case, Mr. Braden's diminished capacity is intertwined with the offense. The Policy Statement provides that the Court should not depart if the facts and circumstances of the offense indicate a need to protect the public because the offense involved actual violence or a serious threat of

violence. In this case, there was no violence, and the threat of violence is undercut by the fact that Mr. Braden, as was his custom, sought help rather than engaging in violence. If the Court finds that § 5K2.13 is technically inapplicable, the facts certainly support a finding that Mr. Braden's conduct differs so dramatically from that generally termed to be terrorism that a substantial departure is appropriate under Section 5K2.0, and that these facts should be considered in the 18 U.S.C. 3553(a) analysis.

Similarly, a departure is appropriate because Mr. Braden voluntarily disclosed his thoughts before taking any action. Under USSG §5K2.16 a departure is appropriate where the defendant voluntarily discloses the offense prior to its discovery. This factor should especially apply in a situation like this one involving an attempt rather than a completed offense. See United States v. DeMonte, 25 F.3d 343 (6th Cir. 1994) (in computer fraud case, departure proper on ground that defendant admitted to crimes about which government had no knowledge, even though plea bargain required cooperation); United States v. Numemacher, 362 F.3d 682 (10th Cir. 2004) (where defendant destroyed illegal pornography before learning of the investigation and where he cooperated with the FBI, conduct "atypical" and justified a downward departure).

The Guidelines also recognize that conduct may not cause or threaten the type of conduct or evil sought to be prevented by the law proscribing the offense. USSSG §5K2.11. Again, under these facts, a person who makes a voluntary disclosure at a mental health facility represents an entirely different type of harm than the "terrorist" contemplated by the Guidelines.

Case 3:04-cr-00163-KAC Document 65 Filed 08/13/07 Page 19 of 21 PageID #: <pageID>

All parties agree that the Court should fashion a sentence that would allow Mr. Braden to receive treatment within the Bureau of Prisons. Treatment is a factor to be considered under 18 U.S.C. § 3553(a)(2)(D). However, there is no credible way to suggest that it would take longer than ten years to stabilize Mr. Braden and allow him to receive all the psychiatric evaluation and treatment necessary. Accordingly, the treatment factor supports Mr. Braden's request for a ten year sentence. See United States v. Yopp, 453 F.3d 770, 773 (6th Cir. 2006) (twenty four month sentence unreasonable to allow defendant to complete 500 hour substance abuse program that only takes one year).

Finally, the Court may consider its sense of what sentence is fair and just. United States v. Jones 460 F.3d 191 (2nd Cir. 2006) (where defendant convicted of felon in possession and possession of firearm and guidelines were 36 months, district court properly imposed non guideline sentence of 15 months when he considered his own sense of was fair and just. "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness.")

## VIII. Conclusion

There is no question that fashioning an appropriate sentence in this case is a daunting task. Taking into account the true circumstances of the offenses as well as the

circumstances of his statements to mental health professionals and then to the authorities, Mr. Braden respectfully submits that a ten year sentence more than adequately satisfies the principles of sentencing, protecting the public's interest while given Mr. Braden a chance to receive the treatment he needs.

Respectfully submitted this 13th[th] day of August 2007.

RITCHIE, DILLARD & DAVIES, P.C.

/s/ WADE V. DAVIES

WADE V. DAVIES (BPR #016052)
606 W. Main Street, Suite 300
P. O. Box 1126
Knoxville, TN 37901-1126
(865) 637-0661
*Counsel for Ivan Duane Braden*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2007, a copy of the foregoing Sentencing Memorandum was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system. A copy was also served on United States Probation Officer Myra Melton via electronic mail.

/S/ WADE V. DAVIES

WADE V. DAVIES

Case 3:04-cr-00163-KAC Document 65 Filed 08/13/07 Page 21 of 21 PageID #: <pageID>