# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 3:04-cr-163 |
| v. | ) | |
| | ) | (District Judge Phillips) |
| IVAN DUANE BRADEN, | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

### I. Introduction

The defendant stands before the Court convicted of three serious crimes: malicious attempt to damage or destroy a building used in interstate and foreign commerce (the National Guard Armory) in violation of 18 U.S.C. § 841(i); possession of unregistered destructive devices (components of homemade hand grenades) in violation of 26 U.S.C. § 5861(d); and possession of a firearm (a shotgun with a pistol grip) in furtherance of a federal crime of violence in violation of 18 U.S.C. § 924(c). As a result of these convictions, the defendant faces a mandatory minimum sentence of ten years, that is, a five-year minimum sentence for the Section 841(i) conviction and a minimum mandatory five-year consecutive sentence for the Section 924(c) conviction.

The maximum combined sentence of imprisonment authorized by statute for all offenses of conviction is 35 years.[1]

The parties differ sharply in their views on specific sentencing issues and, ultimately, as to what will constitute an appropriate sentence in this case. Whatever the issue, these conflicting views typically flow from a fundamental difference in perception of the seriousness of the offense conduct.

The defendant has previously characterized his conduct as mere threats made to get the attention of staff at Peninsula Lighthouse. In his sentencing memorandum, he advances this same notion referring to the defendant's revelation of his attack plan as "provocative statements" and stating that the defendant was attempting to get admitted to the hospital and "described things that he was thinking about that were symptoms of his mental illness." (Doc. 65, defendant's sentencing memorandum at 1, 6.) Such a view of the offense fails to take into account that his plan was real and he had taken substantial steps to carry it out. This minimized view of the defendant's conduct is contradicted by substantial evidence introduced at the preliminary examination. This evidence showed that the defendant had a specific intent and detailed plan to damage or destroy a particular government building and to kill specific government personnel and civilians on a day certain. This evidence also showed the defendant had taken substantial steps to implement his plan, including the accumulation and concealment of weapons and the assembling of a war bag. The

---

[1]The 18 U.S.C. § 841(i) offense of conviction carries a maximum term of imprisonment of 20 years, 26 U.S.C. § 5861(d) carries a maximum term of imprisonment of 10 years, and 18 U.S.C. § 924(c) carries a minimum mandatory term of imprisonment of 5 years.

defendant's characterization of his offense conduct was soundly rejected by the Magistrate Judge who heard that evidence, and is further belied by the stipulated summary of the facts which was, without equivocation or qualification, adopted by the defendant under oath. (Doc. 23, Agreed Factual Basis.)[2]  Finally, and most importantly, this minimization of the offense conduct was repudiated by the defendant himself by his extrajudicial admissions to the FBI and by his judicial admissions by pleading guilty to offenses that require proof beyond a reasonable doubt that he specifically intended to carry out the charged act of violence and took at least one substantial step to carry it out, and that he knowingly possessed weapons.

To be sure, there are mitigating circumstances in this case since the defendant's self-disclosure of his planned attack prevented a terrible tragedy.  But  the starting point for any sentencing analysis must begin with the true nature of the defendant's criminal conduct.  The defendant is not convicted of merely threatening violence, he is convicted of attempting violence.

In accordance with the local rules, the defendant has lodged with the Probation Office a number of specific objections to the pre-sentence report and this memorandum responds to those objections.  The defendant has also filed a sentencing memorandum in which he asks the court for various departures or variances from the Sentencing Guidelines and this memorandum responds to those requests.  Finally, this

_____

[2]The Clerk's office has two files (or at least two docket sheets), No. 3:04-mj-01066 and No. 3:04-cr-00163, both of which relate to this case.  The transcript for the preliminary hearing is referenced only in the docket sheet for Case No. 3:04-mj-01066 at Doc.19.  All other cites to the record in this response refer to Case No. 3:04-cr-00163.

3

memorandum sets forth the position of the United States concerning an appropriate sentence in this case.

## II.  Sentencing Guidelines Calculation by the Probation Officer

In her initial pre-sentence report, the Probation Officer calculated the applicable Guideline range for the Section 841(i) and the Section 5861(d) convictions to be 324 to 405 months imprisonment.   In arriving at this range, the Probation Officer included two victim-related upward adjustments, one being a twelve-level increase in the offense level pursuant to the Terrorism Enhancement set forth in U.S.S.G. § 3A1.4 which is coupled with an enhancement of the criminal history category to Category VI, and the other being a two-level increase of the offense level for there having been an "official victim" in accordance with U.S.S.G. § 3A1.2.  In her calculation, the defendant was also awarded a total of three levels in downward adjustments based upon his "acceptance of responsibility."[3]  The adjusted base offense level, according to this pre-sentence report was 36 and the applicable Criminal History Category was VI.

The Probation Officer subsequently filed an amended pre-sentence report after she learned that the defendant and another inmate had planned an escape from the Blount County jail.  This second report included an additional two-level upward

_____

[3]The defendant's efforts to withdraw his guilty pleas and his persistent minimization of the offense conduct give the United States grounds to object to the downward adjustments for acceptance of responsibility.  The United States has, nevertheless, exercised its discretion to refrain from objecting.  The fact remains that the defendant entered timely guilty pleas and, based upon correspondence sent to the court, the defendant's post-plea behavior has likely been significantly influenced by his well-intentioned father.  For these same reasons, the United States decided not to seek an additional Section 924(c) charge which carries a mandatory 30-year consecutive sentence when, contrary to the plea agreement, the defendant moved to withdraw his guilty pleas.

4

adjustment of the offense level for obstruction of justice. With this change, the adjusted offense level increased to 38 and the criminal history category remained Category VI.

After discussions involving counsel for both parties and the Probation Officer, it was agreed that a three-level decrease of the base offense level pursuant to U.S.S.G. § 2X1.1, dealing with attempted crimes, was appropriate under the particular facts and circumstances of this case. With this adjustment, the offense level was reduced to 35 and, with a Criminal History Category of VI, yielded a Guideline range of 292 months to 365 months. With the mandatory 60-month consecutive sentence required by 18 U.S.C. § 924(c), the effective range is 352 months (29 years, 4 months) to 425 months (35 years, 3 months).

### III. Contentions of the Parties

On or about August 10, 2007, the defendant filed objections with the Probation Officer to the sentencing guidelines calculation. The defendant specifically objected to application of the three-level Official Victim enhancement, contending that the victim was not a government officer or employee. The defendant also objected to application of the Terrorism Enhancement, contending that the defendant's conduct did not constitute a federal crime of terrorism and alleging that the evidence shows the defendant acted for "personal" rather than "political" reasons. Finally, the defendant objected to the Terrorism Enhancement because it placed him in Criminal History Category VI when he had no criminal history points.

On or about August 13, 2007, the defendant filed with the Probation Office a supplemental objection to the Guidelines calculation in which he also objected to the

obstruction of justice enhancement.  In support of this objection, the defendant contends that "he did not participate in an escape attempt."

On August 13, 2007, the defendant also filed a sentencing memorandum in which he contends the applicable Guideline range, but for the minimum mandatory sentences, is 27 to 33 months (adjusted offense level of 18, criminal history category of I) and alternatively moves the court for downward departures or variances on several grounds. (Doc. 65, Ivan Braden's Sentencing Memorandum; Motion for Downward Departure; Request for Variance).  The grounds for a departure or variance from a Guidelines sentence advanced by the defendant are as follows:  (1) the defendant's case is outside the heartland of terrorism cases because his offense was personal, not political; (2) even if the terrorism enhancement is applicable, placing him in Criminal History Category VI overstates his criminal history; (3) the defendant suffers from a diminished mental capacity; and (4) the defendant voluntarily disclosed the offense prior to its discovery.  The defendant contends that considering all of the relevant facts and circumstances and the statutory sentencing factors, the Court should impose a sentence of ten years and fashion a sentence that would "allow Mr. Braden to receive treatment within the Bureau of Prisons."

The Probation Officer has responded to the defendant's objections to the pre-sentence report.  After consideration of these objections, the Probation Officer concluded that the Guideline calculations were correct.

The United States contends that the Guidelines range as calculated by the Probation Officer is correct.  The United States acknowledges there are mitigating circumstances which may justify a sentence below the Guideline range, but contends

6

that these mitigating circumstances can be adequately addressed by limited Chapter 5 (of the Guidelines Manual) departures and no variance is warranted.

For the reasons stated below, it is the position of the United States that the Court should impose a sentence of imprisonment of 248 months to be followed by a term of supervised release of five years. The United States agrees that the Court should recommend that the defendant be placed in a BOP facility where he can receive long-term treatment. Such a sentence can be determined within the framework of the Sentencing Guidelines and it is "sufficient, but not greater than necessary, to" serve the sentencing purposes set forth in 18 U.S.C. § 3553(a). More specifically, this sentence will reflect the seriousness of and provide just punishment for the offenses and, more importantly, will protect the public from further crimes by this defendant while he receives long-term medical care in a secure environment.

## IV.  Sentencing Procedures

In pages 14-16 of his sentencing memorandum, the defendant summarizes the case law governing sentencing procedures after the U.S. Supreme Court decisions in *Booker* and *Rita*. The United States agrees that this summary is an accurate statement of the law as far as it goes. However, given that the legal landscape for federal sentencing has been and continues to be fluid, the United States submits the following additional principles and authorities.[4]

---

[4]"Achieving agreement [post-*Booker*] between the circuit courts and within each circuit has, unfortunately, been like trying to herd bullfrogs into a wheelbarrow."  *United States* v. *McBride*, 434 F.3d 470, 474 (6th Cir. 2006).

Although the Sentencing Guidelines are no longer mandatory after *Booker*, they remain important and the district court must correctly calculate and consider the Guidelines range. *United States* v. *Webb*, 403 F.3d 373 (6th Cir. 2005). The plea agreement also expressly provides that the defendant will be sentenced in accordance with the Guidelines. (Doc. 22, ¶ 4)  The Court's sentencing analysis includes a determination of whether any Chapter 5 (of the Guidelines Manual) departures are appropriate.  The guideline provisions and case law guiding the appropriateness and degree of guideline-based departures remain relevant after *Booker*.   *See*, *United States* v. *Smith*, 474 F.3d 888, 893 (6th Cir. 2007) (holding sentence within the correctly computed upward departure Guideline range will be treated as a within Guidelines sentence and presumed reasonable).  A sentencing court's decision to deny such a departure remains unreviewable on appeal, so long as it is clear the court understood it had authority to depart; a decision to grant a departure will be reviewed for abuse of discretion.  See, *United States* v. *McBride*, 434 F.3d 470, 476 (6th Cir. 2006) (citing *United States* v. *Puckett*, 422 F.3d 340 (6th Cir. 2005)).

After determining the proper Guidelines range, including any upward or downward departures, the district court must consider that range in the context of the other statutory sentencing factors set forth in 18 U.S.C. § 3553(a) to determine a sentence that is "sufficient, but not greater than necessary, to comply with" four sentencing purposes set out in 18 U.S.C. § 3553(a)(2). The court is prohibited from considering the impact of the § 924(c) conviction in making this determination.  *United States* v. *Franklin*, – F.3d –, 2007 WL 2416436 (6th Cir. Aug. 28, 2007).  A sentence that is greater than or less than the Guideline sentence is considered a variance.

8

After *Booker*, a sentence is reviewed on appeal for correct calculation of the Guidelines and to determine whether the sentence, in view of the statutory sentencing factors and purposes, is procedurally and substantively "reasonable." The defendant correctly states that the Supreme Court in *Rita* affirmed that federal courts of appeals may afford a "presumption of reasonableness" to "within guideline" sentences imposed by a district court. The Sixth Circuit Court of Appeals has adopted this standard of review. In our circuit, the court of appeals *will* give a sentence that is within a properly calculated guideline range a "rebuttable presumption of reasonableness." *United States* v. *Williams*, 436 F.3d 706, 708 (6th Cir. 2006), *cert. denied* 127 S. Ct. 3043 (2007).

In this case, calculation of the correct Sentencing Guideline range is in dispute in several respects. The court will need to resolve these issues making appropriate factual findings and interpreting the relevant sentencing guideline provisions. *See*, *United States* v. Stone, 432 F.3d 651, 654-55 (6th Cir. 2005) ("*Booker* did not eliminate judicial fact-finding . . . and sentencing courts must "calculate Guideline range as they would have done prior to *Booker*"). However, with one exception, the information and evidence underlying the sentencing enhancements made by the Probation Officer is already in the record. The obstruction of justice adjustment is based upon events that occurred after the defendant entered his guilty pleas and was pending sentencing. An evidentiary hearing will be necessary to establish the relevant facts and circumstances.

9

## V. Background Facts

On October 12, 2004, the defendant attended a counseling session at Peninsula Lighthouse in Knoxville. The defendant contends this counseling session was "voluntary," and that he went to the hospital for help instead of going to the armory to carry out his planned attack. Peninsula records, however, indicate that this counseling session occurred at the urging of Peninsula staff after the defendant cancelled two appointments and said he was not taking his medication. (Sealed Exhibit to Defendant's Sentencing Memorandum.) [5]

While at Peninsula Lighthouse, the defendant disclosed a plan to take over the National Guard Armory in Lenoir City, take hostages, and kill both military and civilian personnel. He named Robert Williams as one of the intended victims. The defendant also claimed to have explosives and other weapons to be used in the attack. Obviously assessing the defendant as a serious and imminent risk of harm to other persons, Peninsula arranged for an emergency and voluntary admission of the defendant to Peninsula hospital and warned various law enforcement agencies, the National Guard, and Mr. Williams.

When the defendant was interviewed by the FBI, he reiterated his plan and provided specific details. He at no time claimed that he had been merely puffing to get the attention of his doctors. The attack plan details included that the defendant intended to kidnap and kill Sergeant Major Williams and that he planned to kidnap other hostages. He would then periodically execute hostages until the Army National Guard

_____

[5]Butner apparently interpreted the Peninsula records in a similar way. (Doc. 33, report of first Butner admission, p. 19.)

met his demands to produce his commanding officer, Captain Charles Leslie, so he could kill him. (Doc. 23, Agreed Factual Basis, ¶ 8.)

In response to Peninsula's warning, agents of the FBI and other law enforcement agencies went to the defendant's residence and interviewed his father. The defendant's father told the agents, among other things, that while in the seventh grade the defendant had become obsessed with various hate groups and had developed negative views toward Jewish people and the government. Notwithstanding any anti-government views, the defendant had joined the Tennessee Army National Guard. (Case No. 3:04-mj-01066, Doc. 19, transcript of preliminary hearing at 7.) According to his father, the defendant had recently attended military training in Mississippi and when he returned his father observed unusual behavior and encouraged the defendant to seek psychiatric counseling.

With the father's consent, a limited search of the residence was conducted. During the search of the defendant's bedroom, agents found incriminating evidence including a partially completed bomb with the words "bye-bye" written on it, various knives, a Nazi flag, what appeared to be extremist literature, and three video tapes labeled "Nazi America," KKK History," and "Knights of the Living Dead," and various incriminating drawings and writings. (*Id.* at pages 9-19.)

The defendant's father told agents that his son also had a shotgun, but he had instructed him to get rid of it. Agents found an ammunition belt containing 25 shotgun shells, but did not find a shotgun in the Braden residence on October 12. (*Id.* at pages 19-20) However, agents returned to the Braden residence the next day and

found a shotgun with a pistol grip handle hidden under a mattress in the defendant's bedroom. (*Id.* at page 21.)

On October 12, 2004, agents also learned that the defendant's car was parked at Peninsula Lighthouse. The vehicle was searched after a bomb dog alerted on the car. Inside the passenger's compartment, agents found a backpack containing all the components for four functional destructive devices, three knives, a wire cutter, fishing wire, camouflage pants, rope, a dark colored toboggan, and dark colored gloves. (*Id.* at pages 25-26, 32, 64-68.)

The defendant pleaded guilty to a three-count information on November 8, 2004. While he was pending sentencing, the defendant was hospitalized three times at Butner. The Court heard extensive testimony about these hospitalizations last May. (Doc. 69, Transcript of testimony of Dr. Landis.)

In January, 2005, and while the defendant was pending sentencing, Blount County authorities learned that the defendant and at least one other inmate were planning to escape from the Blount County jail. The underlying facts are set forth in paragraph 27 of the pre-sentence report.

## VI. Defendant's Objections to Guideline Calculation

### A. Application of the "Terrorism Enhancement"

In his sentencing memorandum, the defendant argues that the Terrorism Enhancement should not be applied in this case because he is not a "terrorist," and his conduct was motived by personal considerations, not by a political agenda. These arguments are without merit. The issue is not whether the defendant is a "terrorist," but

12

whether his admitted conduct renders the Terrorism Enhancement applicable in sentencing.

The Terrorism Enhancement set forth in U.S.S.G. § 3A1.4 is found in that chapter of the Sentencing Guidelines that provides for victim-related enhancements and states as follows:

**3A1.4. Terrorism**

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

The application notes to this guideline provide, in part:

*Application Notes:*

*1. "Federal Crime of Terrorism" Defined.—For purposes of this guideline, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5).*

*\* \* \**

*3. Computation of Criminal History Category.— Under subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI.*

*4. Upward Departure Provision.—By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, the adjustment provided by this guideline applies only to federal crimes of terrorism. However, there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses*

13

*specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); or (B) the
offense involved, or was intended to promote, one of the offenses
specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the
terrorist motive was to intimidate or coerce a civilian population,
rather than to influence or affect the conduct of government by
intimidation or coercion, or to retaliate against government conduct.
In such cases an upward departure would be warranted, except
that the sentence resulting from such a departure may not exceed
the top of the guideline range that would have resulted if the
adjustment under this guideline had been applied.*

Section 2332b of Title 18 defines a "federal crime of terrorism" as one of
the several enumerated offenses identified in the statute that was committed with the
requisite "terrorism motive," that is, the offense was "calculated to influence or affect
the conduct of government by intimidation or coercion" or "to retaliate against
government conduct." 18 U.S.C. § 2332b(g)(5). Also see, *United States* v. *Meskini*,
319 F.3d 88 (2nd Cir. 2003). The term "government" is not limited to the United States
Government, but also includes government at all levels within the United States and
governments of foreign countries. *United States* v. *Harris*, 434 F.3d 767 (5th Cir. 2005)
(conduct calculated to retaliate against city police department); *United States* v.
*DeAmaris*, 406 F.Supp.2d 748 (S.D. Texas 2005) (conduct calculated to influence
government of Colombia).

Section 841(i) of Title 18 is one of the statutes listed in Section
2332(b)(g)(5)(B). The defendant's possession of destructive devices involved and was
intended to promote the Section 841(i) offense in that these obviously were among the
weapons he intended to use in attacking the National Guard Armory. The shotgun was
also possessed in furtherance of the Section 841(i) violation as alleged in Count 3 of the
information to which the defendant likewise pleaded guilty. If these offenses were

14

"calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct," the Terrorism Enhancement applies. *Harris* at 773 (where defendant convicted of violating 18 U.S.C. 844(i), all sentencing court was required to determine was whether offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."); *also see, United States* v. *Graham*, 275 F.3d 490 (6th Cir. 2001).

The defendant's admitted conduct clearly demonstrates that his offenses were "calculated to influence or affect the conduct of government by intimidation or coercion" and "to retaliate against government conduct,"  The National Guard sent the defendant home from Mississippi, ordered the defendant to undergo a medical board evaluation, and told him to furnish a medical evaluation report to the Guard within certain time limits.  These instructions were delivered to the defendant during a counseling session with retired Sergeant Major Robert Williams, who at that time was a civilian employee of the National Guard.  Thereafter, the defendant planned to attack the National Guard Armory, take Robert Williams and others hostage and demand that the Tennessee National Guard deliver up his commanding officer, Captain Charles Leslie, so the defendant could beat and kill him.  The defendant admitted that he planned to periodically execute hostages until his demands were met.  (Doc. 23, Agreed Factual Basis ¶ 8.)   He clearly was angry with the Guard and perceived that he had somehow been mistreated.  The defendant's actions and words also clearly indicate that his offense was also calculated to retaliate against the National Guard.

While acknowledging the statutory definition of a "federal crime of terrorism," the defendant nevertheless argues that his crimes do not fit this definition because they were not committed for a political purpose and the defendant had no political agenda. It may be inferred from the defendant's interest in hate groups, his negative views toward Jews and the government, and his claimed conversations with two "Skinheads" which led to his selection of the Armory as a target, the defendant had an anti-government political agenda. This is not necessary, however, for the Terrorism Enhancement to apply.

There is no universally accepted definition for "terrorism," and Congress itself has defined "terrorism" differently in other contexts. See, *e.g.*, 22 U.S.C. § 2656f(d)((2)[6]. But for sentencing purposes, a "federal crime of terrorism" has a specific meaning mandated by Congress and adopted by the Sentencing Commission.

There simply is no "political purpose" requirement, express or implied, in the statutory definition, and this is illustrated by the case of *United States* v. *Harris* cited above. In *Harris*, the defendant was convicted violating 18 U.S.C. §§ 841(i) and 924(c) by throwing a homemade explosive device, a Molotov cocktail, into the City of Monahans, Texas Municipal Building which housed, among other things, the city police department. The defendant pleaded guilty to both charges and was sentenced to a total of 360 months imprisonment. In arriving at the Guidelines sentence of 240 months for the Section 841(i) conviction, the district court applied the Terrorism Enhancement.

---

[6]Section 2656f requires the Secretary of State to submit annual reports on terrorism to Congress and subparagraph (d)(2) defines terrorism for purposes of this reporting requirement as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."

16

On appeal, the Fifth Circuit Court of Appeals affirmed. Applying a clear error standard of review, the appellate court concluded there was sufficient evidence to support the district court's factual finding that the defendant was retaliating against city police officers who had previously arrested him and were pursuing charges against his father. Although his motives were purely personal, his conduct was calculated to retaliate against government triggering the Terrorism Enhancement.

The defendant suggests his statements were mere puffing, made to get psychiatric help. This argument is belied by the defendant's admissions of an intent to attack the armory and named individuals, his detailed plan, his definite time-table, and the various substantial steps he had taken to implement the plan. This objection should be overruled.

## B. Application of the Official Victim Enhancement

The Probation Officer's calculation of the offense levels includes two upward "victim-related" adjustments, and both are based on the fact the defendant's crimes were, in a sense, directed at government. However, these two enhancements protect two distinct classes of victims.

The defendant received a three-level upward adjustment of the offense level for an intended "official victim" and received an additional 12-level bump because his crime was calculated to coerce or retaliate against government, also a victim-related enhancement. The defendant objects to this inclusion of two victim-related enhancements, contending it constitutes impermissible "double counting."

There are, however, at least two fallacies in this contention. First, "double counting" is not precluded unless expressly prohibited by the Guideline provisions

17

themselves. § 1B1.1 n.4 (1993); *United States* v. *Cobleigh*, 75 F.3d 242, 251 (6th Cir. 1996). Second, this argument fails to recognize that the Official Victim Enhancement and the Terrorism Enhancement protect two different classes of victims. The Official Victim Enhancement increases punishment for harm (or intended harm) to individual government (or former) employees or family members of government employees; the enhancement expressly does not apply to harm caused to governmental entities. § 3A1.2 n.1. The Terrorism Enhancement, in contrast, is focused on governmental entities and enhances punishment for coercing or retaliating against "government."

The defendant intended to attack the Armory, kill individuals working there, take Robert Williams hostage, and demand that the Army National Guard produce his commanding officer, Captain Charles Leslie, so that he (Braden) could beat and kill him. There can be little doubt that, had the defendant completed his plan, the Court would feel quite justified in imposing of both enhancements to punish for the harm caused to both classes of victims. Under the federal Sentencing Guidelines, a defendant is held accountable for all relevant conduct and all intended harm. U.S.S.G. § 1B1.3.

### C.     Obstruction of Justice

The Court must wait on the facts to be developed in a sentencing hearing to decide this issue. It is clear that conspiring or attempting to escape from jail while one is pending sentencing constitutes obstruction under the Guidelines. U.S.S.G. § 3C1.1, n.4(e); *United States* v. *McDonald*, 165 F.3d 1032 (6th Cir. 1999).

## VII.  Defendant's Requests for Departures or Variances

### A.  Departure for Voluntary Disclosure

U.S.S.G. § 5K2.16 provides, in part:

"If the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a downward departure may be warranted."

The defendant claims that he went to the hospital to get treatment instead of going to the Armory to commit an act of violence.  He intimates this is an indication his attack plan was not a serious one or, at least, that he made a conscious choice to abandon his planned act of violence. The Peninsula records, however, indicate that the defendant was coaxed in for a counseling session after he had cancelled two sessions and admitted that he was not taking his medication.  His psychiatrist did note that the defendant "appears to have a conscience that has kept him from engaging in violent activities."  (Doc. 65, defendant's sentencing memorandum at 7.)   It remains plausible, however, that the defendant's attack plan simply spilled out of an angry young man during this counseling session.  In either case, there is no doubt that authorities were unaware of his plan until he disclosed it, and it is unlikely they would have become aware of it until it was too late to stop the attack.

We will probably never know for certain whether the defendant's disclosure was a product of his conscience or was just good fortune.  What is known is that the defendant's disclosures to Peninsula staff and later the FBI ensured that his attack plan would not progress further. As a result of the defendant's disclosure and the diligent response by both mental health professionals and law enforcement, a great

tragedy was averted. It seems clear that self-disclosure for this type of crime is especially important since loss of life and damage to property can be prevented, and on this point the parties agree. (*Id.* at 19.) Therefore, the United States agrees that a downward departure under U.S.S.G. § 5K2.16 is appropriate in this case.

Section 5K2.16 offers no guidance as to the degree of departure. Accepting responsibility for the crime is, according to the Guideline, a prerequisite to getting a departure, and the defendant has already received a three-level reduction for acceptance of responsibility.

The defendant also received a three-level reduction under § 2X1.1(b)(attempts). A defendant is ineligible for this reduction if he "completed all of the acts the defendant believed necessary for successful completion of the substantive offense" or if the defendant "was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control." This provision, then, covers the situation where a defendant voluntarily withdraws from committing an offense.

Voluntary disclosure seems to be in the same vein as accepting responsibility and withdrawing from an offense. Using the three-level reductions called for by those Guideline provisions as a guide, it would seem reasonable to award the defendant in this case an additional three-level reduction for his voluntary disclosure. This means the defendant would receive reductions totaling nine offense level based upon his going to the hospital, alerting others to his plan, and accepting responsibility for his criminal conduct.

20

## B. Departure of "Excessive Criminal History"

The defendant contends that this case falls outside the heartland of terrorism cases because the defendant acted "as a result of, and in an attempt to get treatment for, a serious mental disorder." (Doc. 65, page 18). This contention fails to recognize that the defendant has been convicted of specifically intending to attack the Armory and taking at least one substantial step to carry out the attack. It also fails to recognize that the defendant has been convicted of "federal crimes of terrorism," whether or not he is a "terrorist" by some unspecified definition. As the *Harris* case cited above demonstrates, this case is not outside the heartland of cases involving the use or threatened use of violence to coerce government or retaliate against government.

The defendant also seeks a departure alleging that Terrorism Enhancement "drastically overstates his criminal history." (Doc. 65, page 18.) This is a closer question and merits some discussion.

The United States is aware of limited case authority to support an "excessive criminal history" departure where the Terrorism Enhancement has been applied. In upholding the Terrorism Enhancement against a due process challenge, the Second Circuit Court of Appeals said that Congress and the Sentencing Commission had "a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus terrorists and their supporters should be incapacitated for a longer period of time." *United States* v. *Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003). According to the *Meskini* court, it was reasonable for the Guidelines to

21

make adjustments in the sentencing guidelines "along both the offense level and criminal history axis," but, in dicta, the court added that departures may be appropriate in exceptional cases: "Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases." *Id.* The avenue for dealing with those exceptional cases, according to *Meskini*, is a criminal history departure: "A judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing." *Id.*

Guideline § 4A1.3 authorizes both upward and downward departures based on inadequacy of the criminal history category. Generally, a downward departure is authorized when reliable information "indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes. § 4A1.3(b)(1). This kind of departure, however, is expressly excluded for an Armed Career Criminal (§4B1.3) or a repeat and dangerous sex offender against minors (§ 4B1.5). §4A1.3(b)(2)(B). No similar exclusion is stated for the Terrorism Enhancement.

The degree of a downward departure on "over-representation" grounds is limited by § 4A1.3(b)(2) in some instances. Generally, a departure on this ground cannot go below the lower limit of the applicable guideline range for Criminal History I. For Career Offenders [§ 4B1.1], a departure cannot exceed one criminal history category. § 4A1.3(b)(3)(A). Again, there are no express provisions concerning the Terrorism Enhancement.

22

At least two courts after *Meskini* have granted a departure on the ground that the enhanced criminal history category of the Terrorism Enhancement resulted in an "excessive sentence." Imran Mandhai was convicted in the Southern District of Florida of conspiring to destroy buildings affecting interstate commerce in violation of 18 U.S.C. §844(n). Over Mandhai's objection the district court applied the Terrorism Enhancement which resulted in a sentencing range of 188-235 months. The district court, however, thought this range excessive given the nature of the offense and granted a departure based upon the fact the offense of conviction was an inchoate or incomplete crime. Both the defendant and the United States appealed.

On appeal, the Eleventh Circuit agreed that the sentencing range was excessive, but ruled that the reason articulated for a departure was not valid. Inchoate crimes, the court said, were brought into the [terrorism] enhancement's heartland when the Sentencing Commission "extended it to any offense involved in or was intended to promote a federal crime of terrorism." *United States* v. *Mandhai*, 375 F.3d 1243, 1249 (11th Cir. 2004).

The court nevertheless ordered a new sentencing hearing, finding that a 12 level increase to Mandhai's offense level required by the terrorism enhancement "prevents the penalty from fitting the crime, based on the facts of this record." *Id.* Concluding that a sentence range of 188 to 235 months "is excessive for the crime Mandhai committed, the case was remanded for a new sentencing hearing at which the district court should consider new grounds for the downward departure." *Id.* at 1250.

On remand, the district court seemed somewhat confused by what it viewed as a mandate to grant a departure on some ground it had already considered

and rejected. While the appellate court had indicated it was the increase in offense levels that resulted in an excessive sentence, the district court on remand granted a one category criminal history departure on the basis of § 4A1.3 and sentenced the defendant to 168 months imprisonment. The defendant appealed this new sentence, but the government did not appeal. The sentence was affirmed on appeal after remand in an unpublished opinion. *United States* v. *Mandhai*, 179 Fed Appx, 576, 2006 WL 1168806 (May 2, 2006).

A district court in Virginia recently granted an "excessive criminal history" departure after a applying the Terrorism Enhancement to a defendant convicted of obstructing an investigation into, among other things, Jihad training camps. *United States* v. *Benkahla*, –F.3d–, 2007 WL 2254657, (E.D. Va. Aug. 3, 2007). The defendant had been convicted of lying to a federal grand jury and FBI agents about his participation and the participation of others in Jihad training camps in Pakistan. The district court viewed placement of the defendant in Criminal History Category VI when there was no evidence of other criminal conduct and other personal circumstances indicated his likelihood of committing another crime were "infinitesimal," clearly over-represented the seriousness of his criminal history. The court departed from a Criminal History Category VI to a Criminal History Category of I and imposed a sentence of 121 months. *Id.* at page 10-11.

Despite the existence of this case authority, none of which is binding on this Court, the United States submits that it remains unsettled whether an "excessive criminal history" departure is proper in the context of the Terrorism Enhancement. Placement of defendants who commit federal crimes of terrorism in Category VI is not

based upon criminal history at all. Rather, this was the Sentencing Commission's mechanism for fulfilling an explicit congressional mandate to increase penalties for defendant's who commit such crimes. Granting departures on the criminal history axis can completely undermine the intentions of Congress and the Sentencing Commission.

Moreover, since the enhancement to Category VI is based upon whether the the offense of conviction was, involved, or promoted a "federal crime of terrorism," there is no relevant criminal history point calculation to evaluate as adequate or inadequate. Under these circumstances, the decision to grant or deny a departure will likely resort to an individual judge's concept of the characteristics of a hypothetical "terrorist." This, in turn, can will lead to unacceptable disparity in sentencing, something which is discouraged by both the Guidelines and by statute. 18 U.S.C. § 3553(6).

This potential for disparity is illustrated by considering the three cases mentioned above. In the *Harris* case, the defendant firebombed a city municipal building in retaliation against the police department. Although the case does not discuss the criminal history issue, it appears that the defendant remained in a Criminal History Category VI and received a 240 month Guideline sentence. In *Meskini*, the defendant was convicted of conspiring to destroy buildings affecting interstate commerce and received a one category departure (VI down to V). He was sentenced to 168 months. In *Benkahla*, the defendant was convicted of lying about his participation and the participation of others in terrorism training camps in Pakistan, but he received a departure from Category VI to Category I and a sentence of 121 months.

Offenders like Timothy McVeigh, Eric Rudolph, and Zacarias Moussaoui probably lacked criminal history points too. A young or a foreign-born offender may

have no significant prior criminal record as defined by the Sentencing Guidelines, but the need for lengthy incarceration is based on the commission of a "federal crime of terrorism," not the existence or nonexistence of a criminal record. The defendant in this case is placed in Category VI because he committed such a crime.

In addition, while the defendant in this case may not have a prior criminal record indicating a risk of recidivism, there is evidence of escalating behavior and mental impairments that make him a serious risk to commit violent crime in the future. These considerations are discussed further in part IX of this memorandum.

Based upon the limited legal authority described above and the particular facts of this case, the United States would not object to a departure of one criminal history category (from VI to V), if the court thinks such a departure appropriate.

### C. Departure for Mental Impairment

The defendant also seeks a departure for diminished mental capacity pursuant to Guideline § 5K2.13. By its own terms, however, a departure is not authorized under this Guideline provision if "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." In this case, the defendant is convicted of specifically intending to damage or destroy a government building with explosives and his plan included the murder of numerous individuals. He possessed explosives and other weapons which he planned to use in carrying out his attack. He is not, therefore, a proper candidate for a downward departure under this Guideline.

### VIII. Applicable Guidelines Range

If the Court begins with the Guideline calculations of the Probation Officer and then grants a three-level reduction of the offense level for the defendant's voluntary disclosure, the adjusted offense level is 32. If the court decides to grant a criminal history departure of one category to Category V, the resulting sentencing guideline range is imprisonment for 188 to 235 months. The sentence recommended by the United States is at the bottom of that range. With the addition of the five year sentence mandated by the § 924(c) conviction, the recommended combined sentence is 248 months.

## IX. A Variance is Not Warranted.

In the final stage of the sentencing process, the district court, taking all of the sentencing factors listed in 18 U.S.C. § 3553(a) into consideration, is to select a sentence that is "sufficient, but not greater than necessary, to" serve the sentencing purposes set out in 18 U.S.C. § 3553(a)(2). Those purposes are defined as the need to: (1) reflect the seriousness of the offense, promote respect of the law, and provide just punishment; (2) afford adequate deterrence; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training or treatment. 18 U.S.C. § 3553(a)(2).

Among the statutory sentencing factors to be considered are the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). As noted at the beginning of this memorandum, the parties have characterized the offenses quite differently. To determine its own view of the seriousness of the offenses, the Court should begin by considering the bedrock facts essential to constitute the offenses of conviction. The defendant acted with malice, that it, evil purpose. The defendant specifically intended to

27

damage or destroy the National Guard Armory using explosives. The defendant took at least one substantial step toward completion of the intended crime. The defendant knowingly possessed destructive devices and a shotgun. These basic offense characteristics alone show the defendant's crimes are serious crimes and the defendant is a danger to society.

The detail of the defendant's intended attack are even more alarming. He was angry with the National Guard, and the planned violence was his way of dealing with his anger. The defendant's plan included mass murder, including the execution of hostages until his demands were met. He made the destructive devices after learning how over the internet. He disobeyed a concerned father by retaining and concealing a shotgun with a pistol grip handle. Under these circumstances, the defendant's revelation of his plan cannot be reasonably viewed as idle or impulsive threats made merely to get the attention of his doctors. Nor did he claim them as such when interviewed by the FBI.

Other statutory factors to be considered in sentencing are the history and circumstances of the defendant. 18 U.S.C. § 3553(a)(1). The defendant claims that his mental impairments and lack of a criminal record warrant a variance from the sentence called for by the Guidelines. No mental health professional that the government is aware of, however, has found that the defendant's condition relieves him of responsibility for his criminal acts. Nor has any doctor opined that the defendant's impairments limited his ability to appreciate the wrongfulness of his actions.

It is clear that the defendant is mentally unstable, however. This is a copy of a photograph found in the defendant's bedroom. It was introduced as Exhibit 3 at the preliminary examination.



This is a copy of a sketch found in the defendant's bedroom. It was introduced at the preliminary examination as Exhibit 12.



This is a copy of a writing found in the defendant's bedroom; it may relate to the sketch above (Exhibit 12).



_____

On the same page as this narrative was printed: "Rewrite (Throw in some more blood + some (sic)." This writing was admitted at the preliminary examination as Exhibit 13.

This is a copy of another sketch found in the defendant's bedroom. It was introduced as Exhibit 14 at the preliminary examination.



The record in this case is clear that the defendant's infatuation with homicide and other violence is not new. But this infatuation had escalated from merely fantasizing about harming others to taking action to harm others.

According to the medical records and the testimony of Dr. Landis, the defendant had a history of making threatening statements. In the earlier incidents, the defendants comments were impulsive and not attended by any preparatory actions or even a specific plan. There was no specific time frame for committing a violent act in the earlier incidents, nor was there any indication that the defendant had assembled weapons or ammunition to carry out his threats. (Doc. 69, Dr. Landis' testimony, p. 58-59.) His conduct in this case is far different.

The nature and characteristics of the defendant's mental condition, as far as it is understood, also support a substantial period of incarceration. As the Court is aware, Butner diagnosed the defendant as having several mental impairments, principally schizophrenia, paranoid type, post traumatic stress syndrome, borderline personality disorder, and alcohol and drug dependence. The United States has previously expressed concern that the defendant's repeated embellishments of his symptoms and his untruthfulness on other matters may have hindered Butner in reaching a full and accurate assessment. Nevertheless, even assuming the Butner diagnoses as accurate and complete, the fact remains that the defendant is dangerous and in need of long term therapy. Paranoid schizophrenia is a "serious and persistent mental illness." (Doc. 33, report of first Butner admission at 16.) Predicting future conduct is difficult and uncertain, but "a past history of violent or destructive behavior suggests potential for future acting out." (*Id.* at 20.) Some forms of mental illness,

31

including those with the feature of paranoia, have an increased risk for violence. (*Id.*) While it is "possible" that the defendant's symptoms will lessen over time with ongoing therapy and medication, the prognosis is complicated by his alcohol and drug dependence. (*Id.*) And, "given access," [the defendant] would be highly likely to resuming the use of those substances." (Doc. 69, Dr. Landis' testimony at 25.) The prognosis for the "stabilization" for the defendant is good, however, if he gets treatment including proper medication therapy. (*Id.* at 21.)

As acknowledged by Dr. Landis, the defendant is an angry young man. While the hardships of his youth (described by the defendant), if true, arouse sympathy, his anger and other problems that may be the product of such hardships will not be easily or quickly remedied. His anger and his violent tendencies are clearly related. (see, Doc. 69, Dr. Landis testimony at  42-43.)

The United States contends that the defendant's conduct in this case and his mental condition demonstrate that he is dangerous and in need of long-term treatment in a secure environment.  His mental instability weighs in favor of a longer sentence, not a shorter one.

The defendant claims that a 10 year sentence will be "sufficient" to successfully address the defendant's problems, but no expert has said that such a sentence will be sufficient to successfully address all of the defendant's mental issues. The United States submits this contention is far too speculative to warrant a variance from the sentence called for by the Guidelines.

**X.    Conclusion**

For the reasons stated above, the United States recommends that the Court impose a sentence of imprisonment of 188 months for the offenses in Counts 1 and 2 of the Information, and a consecutive sentence of imprisonment of 60 months for the offense in Count 3 of the Information.  The United States further recommends that he Court impose a term of supervised release of five years which includes special conditions requiring follow-up mental health treatment.  The Court should also recommend to the Bureau of Prisons that the defendant be placed in a secure facility where he can receive long-term mental health treatment.

Submitted this the 10th day of September, 2007.

Respectfully submitted,

James R. Dedrick
United States Attorney

By:    s/David G. Dake                          
David G. Dake
Assistant United States Attorney
800 Market Street, Suite 211
Knoxville, TN  37902
865.545.4167

CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2007, a copy of the foregoing Sentencing Memorandum of the United States was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

s/David G. Dake                          
David G. Dake
Assistant United States Attorney